## W. R. GRACE & CO. v. FORD MOTOR CO. OF CANADA, Limited, et al.*

(District Court, N. D. California, First Division.    March 1, 1921.)

No. 16058.

1. **Shipping ⬉108—Contract construed as to date of loading.**

A contract for the shipment of freight by a specified steamer providing for "June loading," and that, "when vessel is closer at hand, will advise you more definitely as to exact loading date," fixed June as the time at which the steamer should load the cargo.

2. **Shipping ⬉108—Vessel's owner could not arbitrarily fix date for loading cargo.**

Under a shipping contract providing for "June loading," and for delivery of the freight alongside the steamer as fast as the vessel could load, the owner of the vessel could not arbitrarily fix a date for the delivery of the freight.

3. **Shipping ⬉108—No actual breach by shipper, where vessel not ready to load and part of freight on wharf.**

Under a shipping contract providing for delivery of the freight alongside the steamer as fast as the vessel could load, under which the shipper was notified that delivery of freight was to begin on June 27th and be completed by June 29th, where the vessel was not in a condition to load on June 27th, and a part of the shipper's freight was then on the wharf and treated by the vessel's owner as delivered in part fulfillment of the contract, there was no actual breach of the contract by the shipper before the filing of a libel on June 27th.

4. **Contracts ⬉313(1), 316(1)—Action will lie for anticipatory breach before performance due, but not if part performance accepted.**

While an action may be maintained for a breach of contract on a distinct notification by one of the parties that he will not perform the contract, even though performance be not then due, the party aggrieved by such anticipatory breach may not thereafter accept a part performance under the contract, and still maintain his action on such anticipatory breach before performance is due.

5. **Shipping ⬉108—No libel for anticipatory breach, where libelant did not accept repudiation of contract, but seized freight on wharf as delivered in part performance.**

Under a contract for the shipment of 6,200 tons of automobiles and parts by a certain steamer, though the shipper notified the vessel's owner that 4,075 tons was all that would be furnished, and that this would not be furnished if the owner attempted to hold it for freight on the whole 6,200 tons, the vessel's owner, by refusing to accept this as a repudiation of the contract, and by filing its libel against freight then on the pier, elected to accept such freight as part performance of the contract, and could not maintain the libel as for an anticipatory breach, as it could have no action in rem against the freight on the pier, unless delivered and received as freight under the contract, and it was immaterial that the shipper endeavored to have this freight retaken by the railroad carrier that had delivered it.

In Admiralty. Libel by W. R. Grace & Co., a corporation, against the Ford Motor Company of Canada, Limited, and others. Libel dismissed.

⬉For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Decree affirmed 278 Fed. 955.

Andros & Hengstler and Golden W. Bell, all of San Francisco, Cal., for libelant.

McCutchen, Willard, Mannon & Greene and W. F. Williamson, all of San Francisco, Cal., for respondents.

DOOLING, District Judge. This is an action in rem and in personam for breach of contract to furnish cargo for one of libelant's vessels. On February 25, 1916, libelant and respondent entered into the following written contract:

"San Francisco, February 25, 1916.

"Ford Motor Company, San Francisco, Cal.—Gentlemen: Attention Mr. L. C. Davis. We confirm freighting engagement as follows:

"Commodity: 6,200 tons (40 cubic feet each) automobiles and parts, in packages.

"Rate: $47.50 per 40 cubic feet measurement from San Francisco to Wellington, New Zealand, and/or Sydney, Australia, freight prepaid; quantity for each port to be declared within ten days from date.

"Shipment: Per American S. S. Cacique June loading; when vessel is closer at hand, will advise you more definitely as to exact loading date.

"Delivery: To be delivered alongside steamer at San Francisco as fast as vessel can load; otherwise, shippers to pay demurrage at rate of $3,000 per day.

"Total shipment weighs approximately 1,550 tons (2,240 pounds each), measuring about four to one.

"Yours very truly                    W. R. Grace & Co.,
        "[Signed] H. E. Moore, Traffic Manager.
    "Accepted: [Signed] Ford Motor Co. of Canada, Limited,
                                "By L. C. Davis."

[1] As the court construes this contract, it fixed June as the time at which the Cacique should load the cargo of 6,200 tons agreed to be furnished by respondent. Libelant was at all times willing and eager to carry out the contract, while respondent was not willing to furnish more than 4,075 tons of the 6,200 tons contracted for, and on June 14th advised libelant that—

"4,075 tons is the entire cargo that we will furnish for this vessel. If you wish to accept this cargo, you are at liberty to do so on these terms If you take the attitude that there is a contract binding on this company for 6,200 tons space, and attempt to hold this 4,075 tons cargo for freight for 6,200 tons at the above rate, we will decline to load any of the cargo whatever."

To this notification libelant replied:

"We now have to advise you that we stand strictly upon the contract made with you, and insist upon your fulfillment of the same in every particular. We are, and always have been, ready to perform all of our obligations under said contract. We further advise you that we will take such quantity of automobiles as are delivered to us, and hold you responsible for all damages, including demurrage, which we may utimately sustain by reason of any breach of said contract. By taking a smaller quantity of automobiles than the quantity which you contracted to deliver, we do not accept such smaller quantity as a full satisfaction of the contract. but only as a partial satisfaction which it in fact is."

[2] On June 22d libelant informed respondent that delivery of freight was to begin on June 27th and be completed by June 29th. On June 27th, however, the Cacique was not ready to take on cargo, and could not have been made ready to do so. The contract did not permit

libelant arbitrarily to fix a date for the delivery of freight, but required only that freight "be delivered alongside the steamer at San Francisco as fast as vessel can load."

[3-5] This action was commenced on June 27th, at which time there had been no actual breach of the contract on the part of respondent for the reasons: (1) That the vessel was not at that time in condition to load; and (2) there were 1,100 pieces of respondent's freight on the wharf, which libelant treated as having been delivered in part fulfillment of the contract, and notwithstanding the notice that delivery of freight should begin on June 27th, and be completed by June 29th, respondent was required by the contract to deliver only as fast as the vessel could load. As there was, therefore, no actual breach of the contract before the filing of the libel, which, indeed, was filed before performance was due, the action, if maintainable at all, can only be maintained upon the theory that there was an anticipatory breach committed by respondent when it notified libelant that it would furnish only 4,075 tons of freight, and insisted that the amount so furnished should not be held by libelant for the 6,200 tons contracted for.

There is, of course, no doubt that an action may be maintained for a breach of contract upon a distinct notification by one of the parties that he will not perform an executory contract such as this, even though performance be not due at the time of such notification, the notification being regarded as an anticipatory breach; but the party aggrieved by such anticipatory breach may not thereafter accept a part performance under the contract, and still maintain his action upon such anticipatory breach, and before performance is due. In the instant case, by filing its libel in rem against the 1,100 pieces of freight on the pier, libelant, despite its present protests, elected to accept such 1,100 pieces as part performance of the original contract. It could have no action in rem against them, unless delivered and received as freight under the contract. As bearing upon this proposition the testimony of Mr. Carter, libelant's manager, who had charge of the transaction, is of interest.

"Q. So that you knew at that time that the Ford Motor Company had actually delivered 1,100 packages, or thereabouts, of the freight which you in this telegram of the 26th of June demanded it should deliver? A. Yes; but also knew it was delivered by mistake."

"Q. That is, it was not intended as freight for the steamer? A. No; it was not the intention of the Ford Motor Company to give us that freight.

"Q. And it was not received by you as freight? A. It was received as freight.

"Q. It was received as freight? A. It was received as freight.

"Q. Then you had it as freight? A. We did.

"Q. And you thereafter, as set forth in this libel verified by you, proceeded to foreclose a maritime lien upon the 1,100 packages of freight? A. Yes; the railroad at that time was requesting us either, as I remember it, to return or permit them to take away that cargo: they claimed they had made an error in delivering it to us. We naturally, when we placed our libel, libeled everything we could find of Ford. * * *

"Q. You did not comply with any request of the Southern Pacific Company on that subject, if any such was made to you? A. No; we did not.

"Q. But you proceeded two days after that to foreclose a maritime lien upon those packages, didn't you? A. Yes."

While it is true that respondent endeavored to have this freight retaken into possession by the railroad company that had delivered it, yet

this fact is not very material, in view of the action of libelant, as disclosed by the above testimony and by the course pursued by it in proceeding against the packages in rem as against freight in its possession as such. We have, then, an action for breach of contract commenced before performance was due, based upon a claimed repudiation of the contract, but which repudiation was not accepted by libelant as such, because it held 1,100 packages as freight delivered in pursuance to the contract after such repudiation, and proceeded to foreclose a maritime lien against it as such in the very action based upon such repudiation. But if we regard the letters and conduct of respondent as a repudiation of the contract, libelant could only maintain an action thereon by accepting them as such. It could not for one purpose hold the contract as broken, and for another regard it as in process of being performed. It could not, before performance was due, maintain an action as for an anticipatory breach of the contract, and in the action itself proceed in rem against freight that could not be held as such, unless delivered under and in part performance of the same contract. It is true that in the admiralty an action will sometimes be sustained, even though prematurely brought, where there is some good reason for doing so. But where, as here, performance was not due at the time the action was commenced, where performance of at least a substantial portion of the contract was offered by respondent, and where there is a very grave question as to whether libelant itself was or would be in a position to carry out its portion of the contract, however willing to do so, I do not think that justice requires, or indeed will permit, the maintenance of the action upon an anticipatory breach, unless, when the libel was filed, such breach would sustain it.

During the argument of the case the following colloquy occurred between the court and libelant's counsel:

"The Court: I suppose everybody will agree that the breach must have preceded the filing of the libel?

"Counsel: Yes, your honor; that the breach must have preceded the filing of the libel. I claim that the breach preceded the filing of the libel, and that the breach continued right down to the moment when the libel was filed. We are not tied down even to this anticipatory breach; that it appears from the evidence that at the time the libel was filed.

"The Court: No after breach would support this libel would it?

"Counsel: No; I will rest on the breaches down to the time of the filing of the libel."

At the time the libel was filed the breach relied upon could not support an action, for the reasons hereinbefore stated. At that time the libelant had suffered no injury, and respondent was still entitled to perform its agreement. Whatever rights may have later accrued to libelant, or whatever injury, if any, it may have later suffered, when this action was commenced it was still uninjured, and for this reason the present libel must be dismissed.